BANFF LTD., Plaintiff,

v.

LIMITED, INC. and Express, Inc., Defendants.

No. 93 Civ. 2514 (CSH).

United States District Court, S.D. New York.

Nov. 15, 1994.

Bradley B. Geist, Brumbaugh, Graves, Donohue & Raymond, New York City, for plaintiff.

Frank J. Colucci, Colucci & Umans, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Banff Ltd. ("Banff") is a manufacturer of knitwear, selling its products to retailers throughout the United States. Defendant Express, Inc. ("Express") is a retail clothing store business with over 600 stores throughout the United States. The Limited

Inc. ("Limited") is the self-styled "indirect" corporate parent of Express. The corporate parent is said to be Express Holding Corporation, not a party to the action.

Plaintiff claims that Limited and Express have infringed upon its trade dress and copyright by selling an alleged knockoff of plaintiff's Aran fisherman's sweater ("Banff sweater"). Plaintiff seeks a permanent injunction barring defendants from infringing its copyright and trade dress, as well as damages and costs resulting from the alleged infringements.

While both of the sweaters at issue here are of recent creation, the style from which they derived has a storied history. The Aran style of knitting is believed to date back as far as the Middle Ages, when Irish seamen and their families would create clothing that was not only practical, but which also served to identify their background and relationship to their environment. The typical Aran design "consists of a centre panel with two side panels bordered with cable, signifying the ropes or lifelines on which a fisherman's life might depend." Hollingworth, *The Complete Book of Traditional Aran Knitting*, at 6. The body of the sweater is made up of a variety of standard stitches, such as the Basket Stitch (meant to symbolize the fisherman's basket and an abundant catch) and the Cable Stitch (meant to symbolize the fisherman's rope and its attendant virtues of safety and good luck). It is apparent that there are innumerable ways in which these standard stitches may be and have been combined to create a design that is unique while conforming to the traditional Aran style. *Aran Stitches.*

The Banff sweater was designed by one of its employees, Jeffrey Gray. It incorporates a combination of cabled patterns, traditional stitches and crocheted flowers. The defendants make much of the fact that Gray consulted books on Aran stitching and crocheting in arriving at the sweater design, in the hopes of suggesting a lack of originality in Gray's efforts. Banff does not dispute that the elements of its sweater are standard and well-known, but contends that Gray combined them in a unique design. Banff's sweater was sold by a variety of retailers, including Bergdorf Goodman and Bloomingdale's. Defendants sold their sweater at a chain of outlets operated and managed by Express.

Following extensive discovery, both Limited and Express have moved for partial summary judgment on the trade dress infringement claim. Limited has moved for a dismissal of both the trade dress and copyright claims for failure to state a claim upon which relief can be granted, arguing that it was not the perpetrator of the alleged infringements and thus cannot be held liable. Limited's motion to dismiss relies on information outside of the pleadings, and therefore, pursuant to Rule 12(c) of the Fed.R.Civ.Proc., I will treat the motion as a motion for summary judgment, governed by Rule 56 of the Fed. R.Civ.Proc.

### Discussion

### The Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance*, 804 F.2d 9 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### Limited's Motion for Judgment as to Both Claims

Limited claims that it maintains a separate and autonomous corporate existence in relation to Express, and that it cannot be held liable for the acts of its subsidiary. In support of this contention, Limited asserts that the day-to-day decisions of Express are made by Express officers and employees; that the two entities operate out of different headquarters; that Express maintains its own financial records and files its own franchise tax returns; that decisions about which products to sell are made exclusively by Express; and that Limited does not directly operate any retail stores or directly sell or manufacture any products.

Banff maintains that Limited and Express are sufficiently linked so that Limited may be held liable for the acts of its subsidiary. In support of its claim, Banff contends that Express does not prepare its own income tax return or issue an annual financial report, but rather consolidates its financial results with those of Limited's financial statements and tax returns. It further contends that Express derived profits from the manufacture and sale of the allegedly infringing sweater, that those profits were reflected on Limited's financial statements and tax returns, and thus, that Limited benefitted financially from Express' acts of infringement. This interrelationship between the two entities, according to Banff, renders Limited a "vicarious infringer", even if it had no knowledge of the infringement.[1]

As authority for its position, Limited cites *Williams v. McAllister Bros.,* 534 F.2d 19, 21 (2d Cir.1976), which stands for the proposition that in order to pursue a claim against a parent corporation for the acts of its subsidiary, a plaintiff must establish that the sub-

sidiary is a "mere instrumentality" of the parent. A subsidiary is a "mere instrumentality" when the parent "actually dominates [the subsidiary] such that the subsidiary has no existence of its own and ... [the parent] uses the corporate existence of [the subsidiary] to perpetrate a fraud, resulting in an unjust loss to the [plaintiff]." *Id.,* at 21.

■ Limited's reliance on *Williams* is misplaced. *Williams* deals with the general proposition that the liability of a corporation's shareholders is limited, and that a shareholder such as a parent corporation cannot ordinarily be held liable for the acts of its subsidiary. The common law recognizes, however, that where one has used the corporate form solely to perpetrate a fraud, such that the corporation is really the alter ego of another entity, that entity can be reached to answer for the liabilities of the corporation. *See* Robert Charles Clark, *Corporate Law,* at 71 (1986).

■ Liability for copyright and trade dress infringement, however, flow from Acts of Congress, specifically, the Copyright Act and the Lanham Act. These Acts, rather than the common law, define the scope of liability. The Supreme Court has held that both statutes allow for the imposition of liability upon parties other than those who directly commit the wrongful act. *See, Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The "alter ego" analysis employed by *Williams* thus is inapplicable here.[2]

The Supreme Court has also made it clear, however, that the standards for third-party liability in copyright law and trademark law differ. *Sony,* 464 U.S. at 439, n. 19, 104 S.Ct. at 787, n. 19 ("Given the fundamental differences between copyright law and trademark

---

1. Non-direct infringers can also be held liable under the doctrine of contributory infringement, which places liability upon a party who knew about the infringing activity yet failed to stop it or further encouraged it. Banff has not alleged such knowledge on the part of Limited, and thus I need not consider this doctrine.

2. The "alter ego" test would be relevant if the plaintiff were trying to show that Limited was really the *direct* infringer, due to its utter domination of Express. Banff's claim, however, is grounded in vicarious liability.

law, in this copyright case we do not look to the standard set forth in *Inwood Laboratories ...* which was crafted for application in trademark cases."). I will therefore discuss separately the issues of whether Limited may be held liable for its subsidiary's acts under the Copyright Act, and whether it may be held so liable under the Lanham Act.

## A. Liability Under the Copyright Act

17 U.S.C. § 501(a) declares that "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright." The language of the statute thus raises the question of when such rights have been "violated", a formulation that by its terms does not limit liability to direct actors. Indeed, as noted above, the Supreme Court has made it clear that one may be held liable for the infringing acts of another. *Sony,* 464 U.S. at 435, 104 S.Ct. at 785.[3]

The leading case on vicarious copyright infringement is *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir.1963). *Shapiro* involved a store owner who had leased a part of his premises to a record album seller who proceeded to sell infringing products. The Court explored the relationship between the store owner and the seller and found that the owner received a percentage of the seller's profits; that the owner was responsible for managing the payroll for the employees working for the seller; that the record seller's employees had to abide by the rules promulgated by the owner; and that the employees could be dismissed in the unreviewable discretion of the owner. *Shapiro,* 316 F.2d at 306. Given the nature of their relationship, the Court found the owner vicariously liable for the record seller's infringement, concluding:

"When the right and ability to supervise, coalesce with an obvious and direct finan-

cial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired ... the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation." *Id.,* at 307.

The *Shapiro* standard for vicarious infringement thus creates a two-part test for determining whether a parent corporation can be vicariously liable for its subsidiary's acts: (1) the parent must have "the right and ability to supervise"; and (2) the parent must have "a direct financial interest" in the profits from the infringing activity. As the sole shareholder of Express, Limited undoubtedly benefits financially from the profits Express might earn from sales of the sweater. In addition, such total ownership provides Limited with both the legal and practical opportunity to influence and control the activities of personnel and the decisions made by its subsidiary. Limited thus seems to be a vicarious infringer based on the language of *Shapiro.*

The Court's analysis cannot end there, however, for it is clear that such a finding has serious implications in greatly expanding the reach of the Copyright Act. To apply *Shapiro* in such a way would be to attach liability to every parent corporation for the infringing acts of its subsidiaries, solely because of the parent-subsidiary relationship. Every parent will benefit from its subsidiary's profit-generating activities, and every parent will have the opportunity to guide the affairs of its subsidiary. Indeed, one court has explicitly recognized this and held that the legal relationship between parent and subsidiary, by itself, always satisfies the test for vicarious infringement. *Broadcast Music, Inc. v. Hartmarx Corp.,* 9 U.S.P.Q.2d 1561, 1562, 1988 WL 128691 (N.D.Ill.1988).[4]

**3.** "The Copyright Act does not expressly render anyone liable for infringement committed by another ... The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity." *Sony,* 464 U.S. at 435, 104 S.Ct. at 785.

**4.** As the *Broadcast Music* Court reasoned, "We also find as a matter of law that [the parent] has

the right and ability to supervise its subsidiaries—that is, to guard against or police the allegedly infringing activity. Our conclusion rests in part on the legal relationship between [the parent] and its subsidiaries. Because [the parent] owns a controlling interest in the subsidiaries, it elects the Board of Directors, who in turn select each subsidiary's officers. Control over the Board, then, in effect equals control over the subsidiaries' officers. Since the officers run the

Such a conclusion, however, is of sufficiently potent import that it should not be accepted in the absence of clear authority to that effect. *See Sony*, 464 U.S. at 431, 104 S.Ct. at 783 ("The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme.") I do not read *Shapiro* to have spoken directly to this issue, nor have other cases in this Circuit that have subsequently confronted the matter.

This is not because the issue has not presented itself. In *Artists Music, Inc. v. Reed Publishing*, 1994 WL 191643 (S.D.N.Y.1994), Judge Keenan considered whether trade show organizers could be liable for the infringing activities of their exhibitors. The plaintiff claimed that the organizers were in a position to police the exhibitors for infringing conduct and therefore satisfied the "supervision and control" prong of the *Shapiro* test. In refusing to hold the organizers liable, Judge Keenan, relying on *Shapiro*, wrote that "the mere fact that they could have policed the exhibitors at great expense is insufficient to impose vicarious liability." *Artists Music*, 1994 WL at 6. Thus, while squarely rejecting the notion that the mere opportunity to supervise, without something more, was insufficient for grounding vicarious liability, the Court did not address the fact that the test articulated by *Shapiro* appears to allow for liability in just such a situation. Similarly, in *Singer v. Citibank*, 1993 WL 177801 (S.D.N.Y.1993), Judge Keenan refused to hold two defendants vicariously liable in the absence of evidence that they had "*exercised* the requisite supervision or control over the infringing work." *Singer*, 1993 WL at 5 (emphasis added).

There is one early case, predating *Shapiro*, that seemed to suggest that merely being the

parent corporation was not enough to make one vicariously liable. In *Peter Pan Fabrics, Inc. v. Acadia Company*, 173 F.Supp. 292 (S.D.N.Y.1959), *aff'd*, 274 F.2d 487 (2d Cir. 1960), a corporation that owned 70% of the stock of its subsidiary sought to avoid vicarious liability on the grounds that the infringing fabric had been sold by its subsidiary. In holding the parent liable, the Court examined the evidence of the connections between the two companies and found ten significant pieces of evidence that indicated that the two companies' activities were closely intertwined.[5] *Peter Pan*, 173 F.Supp. at 298. The Court concluded: "The cumulative proof points . . . to the conclusion that [the parent] was substantially connected with the infringing transaction and the course of conduct sought to be enjoined." *Id.* The Court was thus not content to rest its holding on the parent's ownership of 70% of the subsidiary's stock, suggesting that a showing of involvement with the infringement beyond one's mere status as a parent was required. The *Shapiro* Court did not cite to *Peter Pan*.

In the absence of Second Circuit precedent directly on point, it is instructive that two other circuits have ruled that the mere potential to influence inherent in the parent-subsidiary relationship is inadequate to ground vicarious liability for infringement. The Ninth Circuit has held that "a parent corporation cannot be held liable for the infringing actions of its subsidiary unless there is a substantial and **continuing connection between the two with respect to the infringing acts**." *Frank Music Corp. v. Metro–Goldwyn–Mayer Inc.*, 886 F.2d 1545 (9th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) (emphasis added). The Eleventh Circuit has also adopted this standard. *See Howard Johnson*

day-to-day affairs of the subsidiary, control of those officers in turn equals the right to control even the day-to-day matters of the subsidiary. Though [the parent] makes much of the fact that it merely makes "recommendations" to the subsidiaries' CEOs and that the CEOs do not always comply, it cannot be disputed that if a CEO refuses to "cooperate," [the parent] can simply, through its power over the Board, have her removed. Thus, it is clear to us that [the parent] has the right to supervise its subsidiaries' activities—down to a subsidiary's unlicensed use of copyrighted music—through its power to remove

recalcitrant officers. It is the existence of the right to supervise, not whether [the parent] in fact chose to exercise that right, that is at issue." 9 U.S.P.Q. at 1562.

**5.** Among the interconnections: both companies shared the same president; both were located at the same address and had the same phone number; and the design for the infringing fabric was found in an envelope on which was printed the name of the parent.

*Co., Inc. v. Khimani,* 892 F.2d 1512, 1518 (11th Cir.1990). Under this formulation, there must be indicia beyond the mere legal relationship showing that the parent is actually involved with the decisions, processes, or personnel directly responsible for the infringing activity. *See Also, Nimmer on Copyright,* § 134, and the cases cited therein.

I believe that the standard articulated by the Ninth and Eleventh Circuits is the proper one, and that such a rule is consistent with *Shapiro.* In so finding, I am guided by three considerations: (1) the language of *Shapiro;* (2) the principles behind *Shapiro;* and (3) a recent elucidation by the Second Circuit of the *Shapiro* standard. I will consider each of these factors in turn.

With regard to the language of *Shapiro,* in defending its decision to impose vicarious liability upon the store owner, the *Shapiro* Court wrote:

> "[the owner] has the power to police carefully the conduct of its concessionaire ...; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised. [The owner's] burden will not be unlike that quite commonly imposed upon publishers, printers, and vendors of copyrighted materials." *Shapiro,* 316 F.2d at 308.

This language can fairly be read to suggest that the formal relationship between parties is not the driving force behind liability; rather, the parties' paths must cross on a daily basis, and the character of this intersection must be such that the party against whom liability is sought is in a position to control the personnel and activities responsible for the direct infringement. *See, e.g., Demetriades v. Kaufman,* 690 F.Supp. 289 (S.D.N.Y.1988) ("Courts relying on this theory of third-party liability repeatedly have emphasized that some degree of control or supervision over the individual(s) directly responsible for the infringement is of crucial importance."); *Singer,* 1993 WL at 5.

The second factor that supports my conclusion is an examination of the considerations that motivated the *Shapiro* Court. In its thorough discussion of the principles behind vicarious liability, the *Shapiro* Court noted that the doctrine of respondeat superior

clearly placed vicarious liability for an employee's infringement upon the employer. *Shapiro,* 316 F.2d at 307. The record seller in *Shapiro,* however, was not technically an employee of the store owner. Confronted with this, the *Shapiro* Court noted that the "elements which have given rise to the doctrine of respondeat superior ... may also be evident in factual settings other than that of a technical employer-employee relationship." *Shapiro,* 316 F.2d at 307.

In the typical employer-employee relationship, it is reasonable to presume that the employer is intimately linked with and responsible for an employee's acts of infringement. Indeed, when acting within the scope of employment, an employee is presumed to be the employer's agent. In *Shapiro,* the Court clearly felt that on the facts before it, the store owner could be presumed to have the same control over the seller as an employer over an employee, even if the formal relationship did not exist. Indeed, the *Shapiro* Court cited with approval a line of cases finding no vicarious liability for landlords leasing property at fixed rates to tenants engaged in infringing activities. *Shapiro,* 316 F.2d at 307. Unlike the employer-employee relationship, there is no presumption in the landlord-tenant relationship that one party's acts are attributable to the other. Such a presumption can arise, however, upon a factual showing like that in *Shapiro,* where the landlord is more intimately involved with the affairs of the tenant than might typically be the case.

Like the landlord-tenant relationship, the parent-subsidiary relationship is not marked by a presumption that the acts of the one are intimately associated with the other. A subsidiary possesses an independent legal existence; it may organize its affairs and make its decisions completely independently of its parent. Of course, it may also do the opposite and organize its affairs and make its decisions according to the direction of its parent. That parent's influence, however, is characteristic only of that particular parent-subsidiary relationship, and is not inherent in the nature of the relationship in either legal or practical terms. Given that the actual exercise of control cannot be presumed from

the mere power to control, it is logical to require evidence of actual control and supervision before holding the parent liable.[6]

Finally, the last factor that guides my conclusion is the fact that a more recent Second Circuit case on vicarious infringement appears to have modified the language of *Shapiro* to require actual control, rather than simply the power to control. *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89 (2d Cir.1985), involved an attempt to hold a parent publisher liable for copyright infringement engaged in by its subsidiary. The facts of *Sygma* did not present an especially troubling issue with regard to liability—the subsidiary corporation responsible for the direct infringement was found to be a sham corporation, with no employees, operated by the parent solely to avoid liability. *Sygma*, 778 F.2d at 92. There was thus ample evidence that the parent actually controlled the infringing activity, such that the court did not need to address whether the status of being a parent corporation, by itself, was enough to ground vicarious liability for the actions of the subsidiary.[7]

The case is useful, however, for its description of the relevant standard:

"All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers. *See, e.g., Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308–9 (2d Cir. 1963); 3 M. Nimmer, Nimmer on Copyright § 12.04[A], at 12–34 (1985)." *Sygma*, 778 F.2d at 92.

Thus, while *Shapiro* phrased the standard in terms of the *potential* to control, the formulation expressed in *Sygma* appears to require that culpable persons *actually exercise* control.

■ Based on the foregoing, I find that to prevail against a parent corporation on the theory of vicarious copyright infringement, the plaintiff must present evidence that the parent has done more in relation to the infringing activity than simply be the parent. In more precise terms, the plaintiff must show that the parent has a direct financial interest in the infringing activity, and that the parent has the right and ability to supervise the subsidiary, which is evidenced by some continuing connection between the two in regard to the infringing activity.

■ Applying this standard with a recognition that all reasonable inferences must be made in favor of the non-moving party, I think it clear that Limited has shown that it did not exercise sufficient control over Express with regard to the allegedly infringing sweater for it to be vicariously liable. Limited has presented evidence that the day-to-day decisions of Express are made by Express employees only, and that the decision of which sweaters to purchase and sell are made by Express employees only. This evidence is uncontroverted by Banff.

Banff states in its brief that "Limited clearly has the 'right and ability to supervise' its subsidiaries since their financial performance is consolidated with its own and the subsidiaries are obligated to provide Limited with financial reports on a monthly basis." The power to compel consolidation of financial statements, however, does not mean Limited has a continuing connection with the activities and people involved in the alleged infringement. Banff's argument is essentially that Limited is liable solely because it is the parent of Express. I have already rejected that argument as insufficient to ground liability.

Because Banff has failed to present any evidence that Limited had the "right and ability" to supervise Express in connection with the allegedly infringing activity, it has failed to state a copyright claim upon which relief can be granted. Limited's motion for

---

6. As a practical matter, a presumption that a parent can control its subsidiary would be unworkable. The case is easiest when the parent wholly owns the subsidiary, but what of a parent that owns 51% of its subsidiary? Or perhaps 40% of the subsidiary, making it the largest shareholder? The need to determine whether actual control is exercised is inevitable.

7. Indeed, *Sygma* can fairly be read not as a vicarious liability case, but as a case where the court found the parent corporation directly liable as the alter ego of the subsidiary. *See, e.g., Singer*, 1993 WL at 4.

summary judgment is therefore granted with respect to the copyright claim.

### B.  Liability Under the Lanham Act

■ My analysis of Limited's potential liability under the Lanham Act proceeds unassisted by counsel, since neither party has addressed the issue in its brief. Limited took the position that liability under both statutes was governed by the "piercing the corporate veil" analysis, while Banff implicitly took the position that liability under both copyright and trademark law was governed by the same vicarious infringement analysis articulated in *Shapiro*. Nonetheless, both parties clearly believed that one of the issues over which they were arguing was whether Limited could be vicariously liable for trade dress infringement, and I am not precluded from addressing the issue simply because the parties have failed to supply the appropriate legal standard.

The doctrine of vicarious liability for trade dress infringement has not been recognized by the Second Circuit, not because it has been rejected, but because the Court appears to not have had the occasion to consider it. While it might be tempting to apply the standard articulated for copyright infringement, the Supreme Court has made it clear that liability for non-direct infringers under trademark law is narrower than liability under the copyright laws. *Sony*, 464 U.S. at 439, n. 19, 104 S.Ct. at 787, n. 19. While the Supreme Court has articulated a standard for contributory infringement under the trademark law (*See Inwood Laboratories*, 456 U.S. 844, 102 S.Ct. 2182), it has not addressed the standard for vicarious infringement.

Federal courts in other circuits, however, have recognized vicarious liability in the area of trademarks. *See, e.g., Fonovisa, Inc. v. Cherry Auction, Inc.*, 847 F.Supp. 1492 (E.D.Ca.1994). The standards these cases articulate for proving such liability require significantly greater involvement with the infringement by the party against whom vicarious liability is sought than is required under the copyright laws. *See, e.g., Fonovisa*, 847 F.Supp. at 1498 ("Vicarious liability for trademark infringement requires that a defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties, or exercise joint ownership or control over the infringing product."); *David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir.1989).

Therefore, it is apparent to me that I need not address whether vicarious liability for trademark infringement should be recognized in this Circuit, and if so what the standard should be. It is clear that even if the doctrine were to be recognized, the required showing of involvement with the infringement would need to be the same or greater than the showing required by copyright law. Because I have found that Limited's relationship to and involvement with Express is insufficient for vicarious liability under copyright law, it certainly would be insufficient to satisfy any standard under trademark law.

Therefore, Limited has met its burden in showing that as a matter of law it cannot be vicariously liable for Express' trade dress infringement. Its motion for summary judgment is therefore granted as to the trade dress claim.

Limited is thus entitled to judgment on both the copyright and trade dress claims. The only remaining issue is whether Express is entitled to summary judgment on the issue of direct liability under the Lanham Act.

### The Lanham Act Claim Against Express

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits marketing a product that conveys a "false designation of origin." *Stormy Clime Ltd. v. Progroup, Inc.*, 809 F.2d 971, 974 (2d Cir.1987). This provision has been interpreted to "entitle the first manufacturer of a product to an unregistered trademark in the 'trade dress' of its product." *Id.* Trade dress has been defined to be the "total image of a product" and it may include a product's "size, shape, color or color combinations, texture, [or] graphics." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983). While the notion of "trade dress" traditionally envisions a product's labeling or packaging, it has been recognized that a product's design may serve as

its trade dress, entitling its manufacturer to appropriate legal protection. *Stormy Clime*, 809 F.2d at 974.

■■■■ In order to maintain an action for trade dress infringement under Section 43(a), the plaintiff must show either that its trade dress is inherently distinctive, *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) or, if the trade dress is not inherently distinctive, that it has at least acquired secondary meaning, such that the trade dress identifies the source of the product. *Villeroy & Boch Keramische Werke v. THC Systems*, 999 F.2d 619, 620 (2d Cir.1993). In either case, the plaintiff must also show that there is a likelihood of confusion between the original trade dress and the trade dress of the allegedly infringing product. *Id.* Even if the plaintiff establishes these elements, the defendant may still avoid liability on a variety of grounds, one of which is the defense of functionality. *Wallace International Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). This doctrine prevents competitors from obtaining trademark protection for design features that are necessary to the use or efficient production of the product. *Id.*, at 80.

Express argues two propositions in its motion for summary judgment: [8] (1) Banff's sweater design is functional; and (2) Banff's sweater design is not inherently distinctive. [9] Both of these inquiries, whether a design is functional and whether it is inherently distinctive, are questions of fact. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039–40 (2d Cir.1992); *Le Sport-*

sac, Inc. v. K Mart Corp., 754 F.2d 71, 76 (2d Cir.1985). Therefore, in order to prevail on its motion, Express must show that a reasonable fact-finder, making all reasonable inferences in favor of the non-moving party, could not find in Banff's favor on both the functionality and inherent distinctiveness tests. Both of these issues will be analyzed in turn.

### A. Is Banff's Sweater Design Functional?

■■■■ As noted above, competitors may not obtain trademark protection for design features that are necessary to the use or efficient production of the product. *Wallace*, 916 F.2d at 80. While the emphasis on a design's relation to "use" and "efficiency" connotes purely utilitarian concerns, (*Wallace*, 916 F.2d at 80), there is a line of cases recognizing that purely ornamental designs may be aesthetically functional, such that their protection would effectively exclude other competitors from the market. *Id.*

The Second Circuit has embraced the doctrine of aesthetic functionality. In the *Wallace* case, the Court held that the proper standard for determining whether a particular design was aesthetically functional was whether its use "is necessary for effective competition." *Villeroy & Boch*, 999 F.2d at 621. The Court also embraced the language of the *Third Restatement of the Law of Unfair Competition*, § 17(c) at 213–14, which reads:

> "[W]here an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doc-

---

**8.** I note that Express purports to raise one additional argument regarding the Lanham Act claim. In its Amended Complaint, Banff alleges that in addition to infringing its trade dress, Express is liable for false designation of origin, since it placed its own labels upon the allegedly infringing sweater. While Express' memorandum of law begins by asserting that it will show, among other things, that "there is nothing wrong with Limited applying its labels on its own sweaters," Express fails to offer any argument, relevant law, or analysis of the facts relating to this issue. Because it bears the burden of proof on a motion for summary judgment and has offered

none, Express' motion for judgment on this issue is denied.

**9.** Even if Express prevailed on both prongs, Banff could potentially prevail on its trade dress claim if it prove secondary meaning. Express contends, however, that Banff fails to plead secondary meaning in its complaint and that it is thus entitled to judgment if it prevails on the "inherent distinctiveness" prong. Banff maintains that it has pleaded secondary meaning. As will be apparent from the Court's analysis, this issue need not be resolved at this juncture.

trine denies such protection." cited in *Wallace*, 916 F.2d at 81.

This formulation requires a finding of foreclosure of alternatives, as well as a finding that trademark protection does not exclude competitors from substantial markets. *Wallace*, 916 F.2d at 81.

The statement of the law articulated in *Wallace* was applied by the Second Circuit in *Villeroy & Boch*, a case that is quite pertinent here. The case involved the "Basket" chinaware pattern made by plaintiff, and an alleged knock-off called "Bountiful". Basket chinaware was marked by two notable features: a basket motif in the center and a trellis design around the rim. The district court, relying on a standard from a case whose authority it admitted was uncertain, had found the Basket design to be functional as a matter of law. In reversing that finding, the Second Circuit emphasized that the inquiry articulated in *Wallace* requires a focus on the competitive effect of the design at issue:

> "Despite claims to the contrary by [defendant], the district court had insufficient evidence before it to suggest that [defendant] needed to copy the Basket design to compete in the market for hotel china. [Defendant's] claim that hotels typically buy china once every seven years and that they are foreclosed from providing replacement china to hotels using the Basket design without copying the Basket pattern is not enough to meet the market foreclosure test for functionality. The long term nature of the buying patterns in the hotel china market may make it difficult for [defendant] to persuade a hotel to switch to a new pattern once it has started with the Basket design, but [defendant] has not made the necessary showing that it is at a significant competitive disadvantage in making the initial sale without the Basket pattern." *Villeroy and Boch*, 999 F.2d at 621.

Similarly, Express has not presented sufficient evidence to prove that the sweater design for which Banff seeks protection would effectively foreclose competitors from competing in the market for Aran fisherman's sweaters. Both sides agree that the sweater at issue is a traditional Aran fisherman's sweater. Both sides also agree that an Aran fisherman's sweater is characterized by the use of certain stitches that have been in the public domain for centuries. Banff, however, does not seek protection for these central elements, but rather, for what it contends is its unique combination of the elements. The evidence presented by both sides indicates that the traditional elements of an Aran sweater can be, and have been, combined in innumerable ways. In the face of this evidence suggesting the viability of alternative designs, Express has failed to show at this stage of the litigation that it would be foreclosed from competing in the market for Aran fisherman's sweaters if it were unable to market the design at issue here.

The above analysis gains added support from an examination of the approach outlined by the Restatement. In addition to presenting a standard for aesthetic functionality, described above, the drafters offered a variety of illustrative examples applying that standard, including the following three that shed particular light on the present matter:

Illustration 6 reads as follows: "A manufactures china. Among the products marketed by A is a set of china bearing a particular "overall" pattern .covering the entire upper surface of each dish. Evidence indicates that aesthetic factors play an important role in the purchase of china, that A's design is attractive to a significant number of consumers, and that the number of alternative patterns is virtually unlimited. In the absence of evidence indicating that similarly attractive "overall" patterns are unavailable to competing manufacturers, A's pattern design is not functional under the rule stated in this section."

Illustrations 7 and 8.

"7. The facts being otherwise as stated in Illustration 6, A's design consists solely of a thin gold band placed around the rim of each dish. Evidence indicates that a significant number of consumers prefer china decorated with only a gold rim band. Because the number of alternative designs available to satisfy the aesthetic desires of these prospective purchasers is extremely

limited, the rim design is functional under the rule stated in this Section.

8. A is the first seller to market candy intended for Valentine's Day in heart-shaped boxes. Evidence indicates that the shape of the box is an important factor in the appeal of the product to a significant number of consumers. Because there are no alternative designs capable of satisfying the aesthetic desires of these prospective purchasers, the design of the box is functional under the rule stated in this Section."

Illustration 6 is highly analogous to the present case. The aesthetic design of Aran fisherman's sweaters is clearly important to consumers. As evidenced by the featuring of the sweater in *Glamour* magazine, by Bloomingdale's, and by Bergdorf–Goodman, retailers clearly envision that this particular expression of an Aran sweater will be attractive to a significant number of consumers. Nonetheless, there are numerous possible "overall" combinations of traditional stitches, suggesting, in the absence of evidence to the contrary, that appropriation of Banff's particular formulation of an Aran sweater is not necessary to competition in the marketplace.

Illustrations 7 and 8 point to a situation where the particular combination of elements for which protection is sought has a unique hold on consumers, such that alternative combinations would not catch the eye of these customers. Express has not shown that Banff's design falls into this category; indeed, Express argues vociferously that Banff's sweater is not the least bit unique, and is merely an example of a type of sweater that has been in existence for centuries.

Express relies heavily on *Wallace*, a case that originated in this Court. *Wallace* involved a dispute between manufacturers of two baroque-style silverware lines. Both manufacturers' silverware patterns contained typical baroque elements such as indented roots, scrolls, curls, and flowers, and the arrangement of these elements was similar. The only difference between the two patterns was in their dimensions. In finding that the design for which protection was being sought was aesthetically functional, this Court wrote:

"In the case at bar, the "Baroque" curls and flowers are not "arbitrary embellishments" adopted to identify plaintiff's product. Instead, all the "Baroque" style silverware use essentially the same scrolls and flowers as a way to compete in the free market. The "Baroque" style is a line of silverware which many manufacturers produce ... the "Grande Baroque" design is a functional feature of "Baroque" style silverware." *Wallace International Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 735 F.Supp 141 (S.D.N.Y.1990).

Express notes in its brief that the Second Circuit affirmed. It fails to mention, however, that while the Second Circuit affirmed the finding of functionality, it applied a significantly different standard, and one which is far less favorable to Express' position. The standard applied in the district court was that a design is non-functional if it is "a mere arbitrary embellishment", adopted for the purposes of identifying one's product. *Wallace*, 735 F.Supp at 144. That standard arguably could support a finding in Express' favor. The Second Circuit's opinion, however, provides Express with no such authority.

As noted above, in *Wallace* the Second Circuit introduced the governing standard for functionality, grounded not in the manufacturer's purpose in choosing a particular design, but rather, in the effect protection of a particular design would have on competition in the market. In affirming this Court's decision, the Second Circuit held that this Court had found certain facts which supported a finding of functionality, even under the different standard:

"Judge Haight found in the instant matter that there is a substantial market for baroque silverware and that effective competition in that market requires 'use [of] essentially the same scrolls and flowers' as are found on Wallace's silverware ... Based on the record at the hearing, that finding is not clearly erroneous and satisfies the requirement of *Stormy Clime* that a design feature not be given trade dress protection where use of that feature is necessary for effective competition. 809 F.2d at 976–7." *Wallace*, 916 F.2d at 80.

The Court went on to note that Wallace was not seeking protection "for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain." *Wallace*, 916 F.2d at 80.

*Wallace* is thus distinguishable from the present case. First, unlike Wallace, Banff is seeking protection for its particular expression of the elements of an Aran sweater; it is not seeking to foreclose others from competing in the broader market for Aran sweaters. Second, though the Court has not yet made findings of fact in this case, Express has not put sufficient evidence in the record to show that appropriation of this particular design is essential to competition in the market for Aran sweaters.

For all of the above reasons, I find that Express has failed to show at this juncture, with all reasonable factual inferences decided in favor of Banff, that Banff's design is aesthetically functional as a matter of law.

## B. Is Banff's Sweater Design Inherently Distinctive?

▇▇▇ Having failed to show that Banff's design is aesthetically functional as a matter of law, Express may still prevail if it can show that Banff's design is not inherently distinctive, and that it has not acquired secondary meaning.

In *Abercrombie and Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), Judge Friendly established a test for determining inherent distinctiveness in the context of trademarks. Under that test, marks are classified in four ways: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Abercrombie*, 537 F.2d at 9. If the mark is deemed to be suggestive, or arbitrary or fanciful, it is then held to be inherently distinctive. *Paddington Corp. v. Attiki Importers & Distributors*, 996 F.2d 577, 584 (2d Cir.1993). If, however, the mark is merely suggestive, the plaintiff must show that it has acquired secondary meaning. *Id.* Finally, if the mark is generic, it is not protectible. *Id.*

While the test originated in the context of trademarks, the Second Circuit has held it applicable to trade dress claims as well.

*Paddington*, 996 F.2d at 583. In doing so, the Court noted that "[s]ince the choices that a producer has for packaging its products are ... almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive." *Id.* Further,

"Trade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion. While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness. If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements. (cite omitted) ... One could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet." *Paddington*, 996 F.2d at 584.

Applying this standard to the facts before it, the *Paddington* Court found that a "No. 12" Ouzo bottle was inherently distinctive from a "No. 1" Ouzo bottle. Of particular importance to the Court was the fact that the No. 12 bottle was distinguished by unique tones, colors, and letters sizes, and that its overall appearance was undeniably arbitrary. *Paddington*, 996 F.2d at 584. The components of the No. 12 design, the Court wrote, "were selected from an almost limitless supply of patterns, colors and designs." *Id.*

Turning to the present case, I think it quite clear that Express has failed to show that a reasonable fact-finder could not find Banff's trade dress to be inherently distinctive. Express repeatedly emphasizes the historical pedigree and longevity of the various stitches that make up an Aran sweater, but as *Paddington* makes clear, it is the combination of elements and the ultimate impression the trade dress makes that is the proper inquiry. Express puts forward evidence to show that Aran sweaters are a fashion standard, but that same evidence also reveals that there are numerous stitches in

Aran knitting, and that these stitches can be combined in innumerable ways within the confines of a traditional Aran pattern. Indeed these stitches seem akin to the fishermen's alphabet, woven together in different combinations to convey the desired message of its creator.

Thus, Express' argument that Banff's sweater lacks inherent distinctiveness, simply because the various elements are indistinct, is to no avail. Rather, Banff's particular combination of stitches, along with the crocheted flowers around the yoke, suggest that a fact-finder could reasonably find Banff's design to be arbitrary or fanciful.

My conclusion regarding the arbitrary, fanciful character of Banff's sweater is buttressed by Express' failure to show that Banff's particular design has at any time been elsewhere expressed in the marketplace. I consider this finding relevant not because evidence that a competitor had previously introduced a virtually identical design would *per se* render Banff's design non-arbitrary; indeed, it is certainly possible that two competitors could independently design similar products while pursuing fanciful creations. To the extent, however, that numerous expressions of a virtually identical design have previously been on the market, an inference can be made that such a design is not arbitrary, but rather, is prompted by some practical concern among competitors.

Express argues this proposition, contending that Banff's sweater is not at all unique. In support of its position, Express offers an affidavit from Arnetta Kenney, a faculty member at the Fashion Institute of Technology. Ms. Kenney goes through a list of the various elements of Banff's sweater, concluding for each that use of that element is "not original or distinctive, as shown by various publications." With regard to the overall design, however, Ms. Kenney states, notably without any reference to "various publications", that "The combination of a floral trim yoke with a cable sweater is not original or distinctive. It is an obvious combination to

anyone skilled in the art of knitwear design." That the combination is "obvious", however, does not mean that the design is not original, nor, more importantly, that it is not arbitrary or fanciful under the law.

In contrast, Banff's designer, no longer employed by Banff, stated that he did not believe his particular design had ever been expressed in the marketplace prior to the introduction of the Banff sweater. In addition, Banff presented evidence that certain prominent retailers had featured its sweater in their ads. While I am no authority on the marketing practices of the fashion world, the fact that Banff's sweater was featured suggests at least an inference that it is different than other products on the market. Given that such inferences must be made in favor of the non-moving party on a summary judgment motion, I am satisfied that Express has failed to show at this juncture that a reasonable factfinder could not find that Banff's sweater is inherently distinctive.

Since the law requires Express to prove that Banff's trade dress is not inherently distinctive *and* that it lacks secondary meaning, Express' failure on the "inherent distinctiveness" prong obviates the need for consideration of the "secondary meaning" prong.[10]

In summary, Express has failed to meet its burden of proving that Banff's trade dress claim cannot succeed as a matter of law. Express has not shown Banff's trade dress to be aesthetically functional, nor has it shown that Banff's trade dress is not inherently distinctive.

For the foregoing reasons, the motion of defendant Express, Inc. for partial summary judgment dismissing plaintiff's trade dress claim is denied.

The motion of defendant Limited, Inc., for summary judgment dismissing plaintiff's claims against it is granted. There being no just reason for delay, the Clerk is directed to

**10.** As noted in footnote 9, supra, the parties dispute whether Banff has plead secondary meaning in its complaint. My finding that Express has failed to show at this juncture that

Banff's design is not inherently distinctive obviates the need to consider at this time whether Banff is precluded from arguing secondary meaning.

enter judgment in favor of defendant Limited, Inc. and against plaintiff Banff Ltd.

It is SO ORDERED.