**WALLACE INTERNATIONAL SILVERSMITHS, INC.,**
**Plaintiff–Appellant,**

v.

**GODINGER SILVER ART CO., INC.,**
**Defendant–Appellee.**

**No. 1679, Docket 90–7408.**

United States Court of Appeals,
Second Circuit.

Argued July 16, 1990.

Decided Oct. 17, 1990.

Jay H. Begler, New York City (Andrew V. Galway, Arlana S. Cohen, Nancy Deckinger, Liddy Sullivan Galway Begler & Per-

off, New York City, of counsel), for plaintiff-appellant.

Martin Pavane, New York City (Deirdre A. Nicolle, Schechter, Brucker & Pavane, New York City, of counsel), for defendant-appellee.

Before WINTER, MAHONEY and WALKER, Circuit Judges.

WINTER, Circuit Judge:

Wallace International Silversmiths ("Wallace") appeals from Judge Haight's denial of its motion for a preliminary injunction under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), prohibiting Godinger Silver Art Co., Inc. ("Godinger") from marketing a line of silverware with ornamentation that is substantially similar to Wallace's GRANDE BAROQUE line. Judge Haight held that the GRANDE BAROQUE design is "a functional feature of 'Baroque' style silverware" and thus not subject to protection as a trademark. We affirm.

## BACKGROUND

Wallace, a Delaware corporation, has sold sterling silver products for over one hundred years. Its GRANDE BAROQUE pattern was introduced in 1941 and is still one of the best-selling silverware lines in America. Made of fine sterling silver, a complete place setting costs several thousand dollars. Total sales of GRANDE BAROQUE silverware have exceeded fifty million dollars. The GRANDE BAROQUE pattern is fairly described as "ornate, massive and flowery [with] indented, flowery roots and scrolls and curls along the side of the shaft, and flower arrangements along the front of the shaft." Wallace owns a trademark registration for the GRANDE BAROQUE name as applied to sterling silver flatware and hollowware. The GRANDE BAROQUE design is not patented, but on December 11, 1989, Wallace filed an application for trademark registration for the GRANDE BAROQUE pattern. This application is still pending.

Godinger, a New York corporation, is a manufacturer of silver-plated products.

The company has recently begun to market a line of baroque-style silver-plated serving pieces. The suggested retail price of the set of four serving pieces is approximately twenty dollars. Godinger advertised its new line under the name 20TH CENTURY BAROQUE and planned to introduce it at the Annual New York Tabletop and Accessories Show, the principal industry trade show at which orders for the coming year are taken. Like Wallace's silverware, Godinger's pattern contains typical baroque elements including an indented root, scrolls, curls, and flowers. The arrangement of these elements approximates Wallace's design in many ways, although their dimensions are noticeably different. The most obvious difference between the two designs is that the Godinger pattern extends further down the handle than the Wallace pattern does. The Wallace pattern also tapers from the top of the handle to the stem while the Godinger pattern appears bulkier overall and maintains its bulk throughout the decorated portion of the handle. Although the record does not disclose the exact circumstances under which Godinger's serving pieces were created, Godinger admits that its designers were "certainly inspired by and aware of [the Wallace] design when [they] created [the 20TH CENTURY BAROQUE] design."

On the afternoon of April 23, 1990, Leonard Florence of Wallace learned from a wholesale customer, Michael C. Fina Company, that Godinger had placed an advertisement for its 20TH CENTURY BAROQUE serving pieces in an industry trade magazine. George Fina, the company's president, said that he was "confused" when he saw what he believed to be a pattern identical to GRANDE BAROQUE being advertised by another company. He asked Mr. Florence whether Wallace had licensed the design to Godinger or whether "the Godinger product was simply a 'knock-off.'" Two days after this conversation, Wallace filed the complaint in the instant matter stating various federal trademark and state unfair competition claims. Wallace also filed a motion for a temporary restraining order and sought a preliminary injunction prohibiting Godinger

from using the mark 20TH CENTURY BAROQUE or infringing the trade dress of Wallace's GRANDE BAROQUE product.

Due to the imminence of the trade show, the district court held a hearing on Wallace's application for preliminary relief the day after Wallace had filed its complaint. The record consisted of affidavits from Florence and Fina reciting the facts described *supra*, samples of the Wallace and Godinger pieces, and various photographs and catalogue illustrations of silverware from other manufacturers. Later that day, Judge Haight issued a Memorandum Opinion and Order in which he concluded that the GRANDE BAROQUE design was a "functional" feature of baroque-style silverware and thus ineligible for trade dress protection under Section 43(a) of the Lanham Act. In so holding, he stated:

> In the case at bar, the "Baroque" curls and flowers are not "arbitrary embellishments" adopted to identify plaintiff's product. Instead, all the "Baroque" style silverware use essentially the same scrolls and flowers as a way to compete in the free market. The "Baroque" style is a line of silverware which many manufacturers produce. Just like the patterns on the chinaware in *Pagliero [v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952)], the "Grande Baroque" design is a functional feature of "Baroque" style silverware.
>
> Wallace may well have developed secondary meaning in the market of "Baroque"-styled silverware. In fact, I assume for purposes of this motion that anyone that sees, for instance, five lines of Baroque silverware will single out the Wallace line as being the "classiest" or the most handsome looking and will immediately exclaim "Oh! That's the Wallace line. They make the finest looking 'Baroque' forks!" That is secondary meaning. However, that does not mean that plaintiff's design is subject to protection. The "Baroque" curls, roots and flowers are not "mere indicia of source." Instead, they are requirements to compete in the silverware market. This is a classic example of the proposition that "to imitate is to compete." *Pagliero,*

*supra,* at 344. The designs are aesthetically functional.

> Accordingly, I conclude that plaintiff does not have a trade dress subject to the protection of the Lanham Act....

He therefore declined to order expedited discovery and denied Wallace's motion for a preliminary injunction.

## DISCUSSION

In order to obtain a preliminary injunction, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also Warner Bros. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981) ("*Warner I*") (applying *Jackson Dairy* standard to trademark infringement case). In concluding that "the 'Grande Baroque' design is a functional feature of 'Baroque' style silverware," Judge Haight denied Wallace's motion because there was not a fair ground for litigation on the issue of trademark liability. Our review therefore focuses on the functionality issue.

The core purpose of trademark law is to prevent competitors from copying those aspects of a product or its trade dress that identify the source of the product to prospective consumers. *See Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 2188 n. 14, 72 L.Ed.2d 606 (1982); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 309–10 (2d Cir.1972). By giving the first user of a trademark exclusive rights in that mark, the law protects trademark owners' investments in creating goodwill and affords consumers a low-cost means of identifying the source of goods. *See Inwood Laboratories, supra; W.T. Rogers Co. Inc. v. Keene,* 778 F.2d 334 (7th Cir.1985). Although the paradigmatic trademark is a distinctive name, the "trade dress" of a product may also serve as a trademark. A

product's trade dress ordinarily consists of its packaging. However, the design given a product by its manufacturer also may serve to distinguish it from the products of other manufacturers and hence be protectible trade dress. *See, e.g., Stormy Clime Ltd. v. Progroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987) ("The trade dress of a product 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.'") (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)); *Warner I, supra* (color and symbols on toy car); *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946 (2d Cir.1981) (paperback book covers).

■ In order to maintain an action for trade dress infringement under Section 43(a) of the Lanham Act, the plaintiff must show that its trade dress has acquired secondary meaning—that is, the trade dress identifies the source of the product—and that there is a likelihood of confusion between the original trade dress and the trade dress of the allegedly infringing product. *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985). Even if the plaintiff establishes these elements, the defendant may still avoid liability on a variety of grounds, including the so-called

functionality doctrine. Our present view of that doctrine is derived from the Supreme Court's dictum in *Inwood Laboratories,* stating that "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."[1] 456 U.S. at 850 n. 10, 102 S.Ct. at 2187 n. 10. Our most recent elaboration of the doctrine was in *Stormy Clime,* where Judge Newman stated:

> the functionality inquiry ... should [focus] on whether bestowing trade dress protection upon [a particular] arrangement of features "'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Sicilia di R. Biebow & Co. v. Cox,* 732 F.2d 417, 429 (5th Cir.1984) (quoting *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1342 (Cust. & Pat.App.1982)).

*Id.* at 976–77. *Stormy Clime* outlined the factors to be considered in determining functionality as follows:

> the degree of functionality of the similar features, the degree of similarity between non-functional (ornamental) features of the competing products, and the feasibility of alternative arrangements of functional features that would not impair the utility of the product. These factors

---

**1.** We initially adopted the "essential to the use or purpose" test in *Warner Bros, Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983) ("*Warner II*"). In *Warner II,* Judge Oakes's opinion explained that "[a] design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." 724 F.2d at 331. However, in *Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd.,* 725 F.2d 18 (2d Cir.1984), decided just two weeks after *Warner II,* another panel of this court stated that the functionality test was whether the aesthetic feature was an "'important ingredient in the commercial success.'" *Id.* at 19 (quoting *Ives Laboratories, Inc. v. Darby Drug Co., Inc.,* 601 F.2d 631, 643 (2d Cir.1979). This formulation, which is derived from *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952), had been used in earlier cases but widely criticized. *See, e.g., Warner II, supra* at 330; *Keene Corp. v. Paraflex Indus.,* 653 F.2d 822, 824–25 (3d Cir.1981); *Vuit-*

ton et Fils S.A. v. J. Young Enterprises, Inc., 644 F.2d 769, 773 (9th Cir.1981).

In *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71 (2d Cir.1985), Chief Judge Feinberg's opinion addressed the "obvious tension" between *Warner II* and *Charles Craig* and concluded that "[t]he *Inwood Laboratories–Warner II* formulation, in which a feature must be 'essential to the use or purpose of the article' or must affect 'the cost or quality of the article' ... is less susceptible to confusion or an overly broad interpretation." *Id.* at 77 (citation omitted). *LeSportsac* noted that a feature that is an important ingredient in the commercial success of a product might still be functional and expressly ratified *Warner II*'s adoption of the *Inwood Laboratories* definition of functionality. It also harmonized the result in *Charles Craig* by observing that the distinctive features of the sofa design at issue in that case "'constitute[d] an improvement in the operation of the goods' that ought not to be monopolized (absent patent protection), and hence is functional under *Warner II* as well." *Id.* (quoting *Warner II, supra* at 331).

should be considered along a continuum. On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product ...

*Id.* at 977 (citations omitted).

Turning to the instant case, Judge Haight found that the similarities between the Godinger and Wallace designs involved elements common to all baroque-style designs used in the silverware market. He noted that many manufacturers compete in that market with such designs and found that "[t]he 'Baroque' curls, roots and flowers are not 'mere indicia of source.' Instead, they are requirements to compete in the silverware market." Judge Haight concluded that "the 'Grande Baroque' design is a functional feature of 'Baroque' style silverware," relying on *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952).

Although we agree with Judge Haight's decision, we do not endorse his reliance upon *Pagliero*. That decision allowed a competitor to sell exact copies of china bearing a particular pattern without finding that comparably attractive patterns were not available to the competitor. It based its holding solely on the ground that the particular pattern was an important ingredient in the commercial success of the china. *Id.* at 343–44. We rejected *Pagliero* in *LeSportsac, supra* at 77, and reiterate that rejection here. Under *Pagliero*, the commercial success of an aesthetic feature automatically destroys all of the originator's trademark interest in it, notwithstanding the feature's secondary meaning and the lack of any evidence that competitors cannot develop non-infringing, attractive patterns. By allowing the copying of an exact design without any evidence of

market foreclosure, the *Pagliero* test discourages both originators and later competitors from developing pleasing designs. *See Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822, 824–25 (3d Cir.1981).

Our rejection of *Pagliero*, however, does not call for reversal. Quite unlike *Pagliero*, Judge Haight found in the instant matter that there is a substantial market for baroque silverware and that effective competition in that market requires "use [of] essentially the same scrolls and flowers" as are found on Wallace's silverware. Based on the record at the hearing, that finding is not clearly erroneous and satisfies the requirement of *Stormy Clime* that a design feature not be given trade dress protection where use of that feature is necessary for effective competition. 809 F.2d at 976–77.

*Stormy Clime* is arguably distinguishable, however, because it involved a design that had both aesthetic and utilitarian features. If read narrowly, *Stormy Clime* might be limited to cases in which trademark protection of a design would foreclose competitors from incorporating utilitarian features necessary to compete in the market for the particular product. In the instant case, the features at issue are strictly ornamental because they neither affect the use of the silverware nor contribute to its efficient manufacture. The question, therefore, is whether the doctrine of functionality applies to features of a product that are purely ornamental but that are essential to effective competition.

Our only hesitation in holding that the functionality doctrine applies is based on nomenclature. "Functionality" seems to us to imply only utilitarian considerations and, as a legal doctrine, to be intended only to prevent competitors from obtaining trademark protection for design features that are necessary to the use or efficient production of the product. *See Keene, supra* at 825 ("inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature"). Even when the doctrine is referred to as "aesthetic" functionality, it

still seems an apt description only of pleasing designs of utilitarian features. Nevertheless, there is no lack of language in caselaw endorsing use of the defense of aesthetic functionality where trademark protection for purely ornamental features would exclude competitors from a market. *See, e.g., Rogers, supra* at 347 ("Though a producer does not lose a design trademark just because the public finds it pleasing, there may come a point where the design feature is so important to the value of the product to consumers that continued trademark protection would deprive them of competitive alternatives[.]") (Posner, J.). Indeed, the "continuum" in Judge Newman's *Stormy Clime* opinion carefully limited the "distinctive and arbitrary arrangements of predominantly ornamental features" entitled to trademark protection to only those features "that do not hinder competitors from entering the same market." *Id.* at 977.

■ We put aside our quibble over doctrinal nomenclature, however, because we are confident that whatever secondary meaning Wallace's baroque silverware pattern may have acquired, Wallace may not exclude competitors from using those baroque design elements necessary to compete in the market for baroque silverware. It is a first principle of trademark law that an owner may not use the mark as a means of excluding competitors from a substantial market. Where a mark becomes the generic term to describe an article, for example, trademark protection ceases. 15 U.S.C. § 1064(3) (1988); *see Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). Where granting trademark protection to the use of certain colors would tend to exclude competitors, such protec-

tion is also limited. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir.1987); J. McCarthy, *Trademarks and Unfair Competition,* § 7:16 *et seq.* Finally, as discussed *supra,* design features of products that are necessary to the product's utility may be copied by competitors under the functionality doctrine.

■ In the instant matter, Wallace seeks trademark protection, not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain. As found by the district court, these elements are important to competition in the silverware market. We perceive no distinction between a claim to exclude all others from use on silverware of basic elements of a decorative style and claims to generic names, basic colors or designs important to a product's utility. In each case, trademark protection is sought, not just to protect an owner of a mark in informing the public of the source of its products, but also to exclude competitors from producing similar products. We therefore abandon our quibble with the aesthetic functionality doctrine's nomenclature and adopt the Draft Restatement's view that, where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection. *See* Third Restatement of the Law, Unfair Competition (Preliminary Draft No. 3), Ch. 3, § 17(c) at 213–14. This rule avoids the overbreadth of *Pagliero* by requiring a finding of foreclosure of alternatives[2] while still ensuring that trademark protection does not exclude competitors from substantial markets.[3]

---

2. The Draft Restatement's Illustrations expressly reject *Pagliero.* Illustration 6 reads as follows:

A manufactures china. Among the products marketed by A is a set of china bearing a particular "overall" pattern covering the entire upper surface of each dish. Evidence indicates that aesthetic factors play an important role in the purchase of china, that A's design is attractive to a significant number of consumers, and that the number of alternative patterns is virtually unlimited. In the absence of evidence indicating that similarly attractive "overall" patterns are unavailable to

competing manufacturers, A's pattern design is not functional under the rule stated in this Section.

3. Draft Restatement Illustrations 7 and 8 reflect this aspect of the rule. They read as follows:

7. The facts being otherwise as stated in Illustration 6, A's design consists solely of a thin gold band placed around the rim of each dish. Evidence indicates that a significant number of consumers prefer china decorated with only a gold rim band. Because the number of alternative designs available to satisfy

Of course, if Wallace were able to show secondary meaning in a precise expression of baroque style, competitors might be excluded from using an identical or virtually identical design. In such a case, numerous alternative baroque designs would still be available to competitors. Although the Godinger design at issue here was found by Judge Haight to be "substantially similar," it is not identical or virtually identical, and the similarity involves design elements necessary to compete in the market for baroque silverware. Because according trademark protection to those elements would significantly hinder competitors by limiting the range of adequate alternative designs, we agree with Judge Haight's denial of a preliminary injunction.

Affirmed.

---

the aesthetic desires of these prospective purchasers is extremely limited, the rim design is functional under the rule stated in this Section.
8. *A* is the first seller to market candy intended for Valentine's Day in heart-shaped boxes. Evidence indicates that the shape of

the box is an important factor in the appeal of the product to a significant number of consumers. Because there are no alternative designs capable of satisfying the aesthetic desires of these prospective purchasers, the design of the box is functional under the rule stated in this Section.