KURT S. ADLER, INC., Plaintiff,

v.

WORLD BAZAARS, INC., Defendant.

No. 95 Civ. 5610 (PKL).

United States District Court,
S.D. New York.

Aug. 16, 1995.

Cowan, Liebowitz & Latman, P.C., New York City (Robert J. Bernstein, of counsel), for plaintiff Kurt S. Adler, Inc.

Anthony Cormier, Woodland Hills, CA, Mound, Cotton & Wollan, New York City (Jon Quint, of counsel), for defendant World Bazaars, Inc.

### OPINION AND ORDER

LEISURE, District Judge:

Plaintiff Kurt S. Adler, Inc. ("Adler") seeks a preliminary injunction against defendant World Bazaars, Inc. ("WBI"), on the ground that WBI's "Musical Bubble Blowing Santa" Christmas tree ornament infringes plaintiff Kurt S. Adler, Inc.'s ("Adler's") copyright and trade dress rights in Adler's "Christmas Bubble Santa" Christmas tree ornament. On July 27, 1995, this Court issued a temporary restraining order against WBI, provided that Adler post a $100,000 bond, which Adler did the following day. On August 10–11, 1995 and August 15, 1995, this Court held a hearing on Adler's motion for a preliminary injunction.

For the reasons stated below, Adler's motion for a preliminary injunction is granted, effective immediately, provided that Adler posts a bond of $435,000, by Friday, August 18, 1995, at 5:00 P.M.

### DISCUSSION

In this Circuit:

> In order to obtain a preliminary injunction, the moving party must show (1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor.

*Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 967 (2d Cir.1995) (citations omitted). Mindful of this standard, the Court first considers Adler's entitlement to a preliminary injunction on its claim of copyright infringement, then on its claim of trade dress infringement.

### I. Copyright Infringement.

"A plaintiff with a valid copyright proves infringement by demonstrating that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the *protectible* elements of plaintiff's." *Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d 119, 122–23 (2d Cir.1994) (second emphasis added) (citation omitted) ("*Well–Made*

*Toy* "). For purposes of this motion for a preliminary injunction only, WBI has not disputed the fact that Adler owns a registered copyright in the Christmas Bubble Santa. Memorandum of Law in Opposition to the Motion for Preliminary Injunction and in Support of the Cross–Motion to Increase the Bond ("Opp.Mem."), at 2. The Court therefore proceeds directly to the issue of copying.

> The plaintiff may prove copying ... by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work.... In the context of deciding whether the defendant copied at all (as distinguished from whether it *illegally* copied), "similarity" relates to the entire work, not just the protectible elements.

*Well–Made Toy,* 25 F.3d at 123 (emphasis in original) (citation omitted).

■ In this case, with respect to access, the "paint master" (a full-color, three-dimensional model) of Adler's Christmas Bubble Santa was on display in Adler's New York showroom, which is open to members of the trade, by mid-December 1994; about the same time, a second paint master was sent to Hong Kong, where it was shown to potential manufacturers. The paint master that remained in the United States was later on display, and photos of it were available, at the Beckman's Gift Show in Dallas, Texas, on January 7–10, 1995, and at the most important show of the year in the trade, the International Gift and Accessories Market in Atlanta, Georgia, on January 11–20, 1995. *See* Testimony of H. Adler, August 10, 1995. WBI participated in each of these shows. *See* PX 58 (directory for Dallas show); PX 59 (directory for January–Atlanta show); Testimony of Gerald Mignacca (recounting that WBI's main buyer, who traveled to Taipei in January 1995, spent several days at the January–Atlanta show). WBI could have produced its Santa, as it did, by July 1995, had it first observed and copied Adler's Santa as late as January 1995. "Access is only an opportunity to copy." *Fisher–Price Toys Div. of Quaker Oats Co. v. My–Toy Co.,* 385 F.Supp. 218, 220 (S.D.N.Y.1974) ("*My–Toy*

Co."). The Court finds access here, based on WBI's reasonable opportunity to copy Adler's Christmas Bubble Santa.

Turning then to the issue of whether WBI exploited this opportunity, WBI's Musical Bubble Blowing Santa "bears an uncanny resemblance," *Well–Made Toy,* 25 F.3d at 123, in overall appearance, to Adler's Christmas Bubble Santa. For example, each of the Santas has a pear shaped head, a red under-lip emphasized, an upcurving mustache, a skin tone bubble nose, rounded boots, a similarly shaded green basin held in front of Santa, and a hooked bubble wand held in Santa's right hand. *Compare* PX 76 (WBI's Santa) *with* PX 77 (Adler's Santa). WBI would have the Court believe that the two Santas were independently conceived within a few weeks of each other, in October (Adler) and November (WBI) 1994, respectively. However, there is no dispute that Adler had a paint master of its Santa by December 1994, whereas WBI had neither a paint master nor another form of sample of its Santa until some four (4) months later, in April 1995. At most, one month of this disparity is accounted for by the fact that WBI stalled its bubble blowing Santa project between mid-January and mid-February 1995, while it conducted a patent search in response to a cease-and-desist letter from Adler's counsel, in connection with another product, *see* DX D; Testimony of Gerald Mignacca, August 15, 1995. Another month is, of course, accounted for by Adler's alleged one-month headstart in conception and development. But, WBI has not adequately explained the remaining two-month disparity. Adding two months to WBI's claimed November 1994 conception date would yield a conception date in January 1995, when WBI indisputably had access to Adler's Santa. In addition, although WBI claims that it had chosen, by Fall 1994, to enter the market for bubble blowing Christmas tree ornaments with a bubble blowing Santa Claus ornament, WBI's supplier provided it, instead, with a sample of a bubble blowing teddy bear ornament,[1] to display at the Atlanta show in January 1995.

Finally, WBI did not offer the testimony of any of the three persons that it claims were involved in the conception or artistic design of its Santa; nor did it offer the testimony of WBI's main buyer, to disclaim actual copying.[2] Although these points gravely undermine WBI's claim of independent creation, the Court finds fatal to WBI on this point an inspection of the two Santas themselves. *Compare* PX 76 (WBI's Santa) *with* PX 77 (Adler's Santa). In the Court's view, this examination reveals "such substantial similarity [between the two works] that no explanation other than copying is reasonably possible." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n. 2 (2d Cir.1977) (citation and internal quotation marks omitted). "To conclude otherwise would be to find coincidence that defies belief." *Imperial Textile Co. v. Ametex Fabrics, Inc.,* 682 F.Supp. 18, 19 (S.D.N.Y.1987).

■ Actual copying having been established, the Court takes up the central issue raised by Adler's copyright infringement claim—whether Adler has shown "that the copying amounts to an improper appropriation by demonstrating that substantial similarity to *protected* material exists between the two works." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992) (emphasis added). " '[T]he protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself.' " *Id.* at 141 (quoting *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir.1980)); *see also Mattel, Inc. v. Azrak–Hamway International, Inc.,* 724 F.2d 357, 360 (2d Cir.1983). "Just as copyright protection extends to expression but not ideas, copyright protection extends only to the artistic aspects, but not the mechanical or utilitarian features, of a protected work." *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir.1980) (citing *Mazer v. Stein,* 347 U.S. 201, 218, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954)). And, "similarity of expression ... which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped

---

1. The Court finds that, as Adler asserts, the upper-half of this ornament was Adler's bubble blowing Bradley Bear.

2. WBI offered instead only the less-than-illuminating testimony of a relatively junior engineer.

form will preclude a finding of actionable similarity." *Id.* at 916 (internal quotation marks omitted).

After the Court has discerned the protected from the unprotected elements of the original work in accordance with these principles, the Court asks:

> whether an ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other. . . . Where, as here, [the Court] compare[s] products that have both protectible and unprotectible elements, [the Court] must exclude comparison of the unprotectible elements from [its] application of the ordinary observer test. . . .

*Well–Made Toy,* 25 F.3d at 123.

■ Here, there is no dispute that the stereotypical elements of a Santa Claus are unprotectible. The Court finds that these elements are a jolly, rotund, elder gentleman, wearing a red suit and floppy cap with white trim, and a black belt and boots. *Compare Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F.Supp. 980, 986 (S.D.N.Y.1980) ("[F]eatures . . . common to all Santas" include "the traditional red suit and floppy cap, trimmed in white, black boots and white beard . . . [and] the requisite 'nose like a cherry.' ") *with Doran v. Sunset House Distributing Corp.,* 197 F.Supp. 940, 944 (S.D.Cal.1961) (common Santa features include "[t]he red suit and cap with white fur trim, the white hair and beard, the black belt and boots, the ruddy face and the fat form"), *aff'd,* 304 F.2d 251 (9th Cir. 1962). These stereotypical features of a Santa notwithstanding, the Court finds that, from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express of the idea of Santa (as well as the idea of a whimsical Santa). *See, e.g.,* PX 1 (videotape of Adler's showroom); PX 2, at 1–10, 88–92 (Adler's catalogue), PX 4–6 (group photographs of some of Adler's Santas); Testimony of Robert McDarren and Sally Butcher.

■ The Court further finds unprotectible the functional elements that enable these Santas to blow bubbles. *See Tomy,* 630 F.2d at 916 ("The most distinctive feature of the [original] dolls is their ability to walk or crawl, but it is clear from our discussion of the art/utility distinction that [the purveyor of the accused dolls] is free to copy not only the idea of walking or crawling dolls but the mechanism that makes such locomotion possible as well."). The Court finds that these functional elements consist only of a pivoting arm holding a bubble wand, which arm is capable of dipping the wand into a reservoir of bubble fluid and bringing the wand to a round hole in Santa's mouth. The Court finds that the reservoir need not, for the sake of cost or utility, be held in front of Santa's midsection; nor need the reservoir take the form of a basin, as opposed to, for example, a Christmas present; nor need Santa be standing as opposed to seated.

Notwithstanding the fact that Adler's Christmas Bubble Santa incorporates unprotectible elements, the Court finds that there is a substantial similarity between the *protectible* elements of the two works. The expressive choices made in connection with the two Santas' busts and bubble blowing mechanisms create a remarkably similar overall appearance. Each of the Santas has a pear shaped head, a red underlip emphasized, an upcurving mustache, a skin tone bubble nose, rounded boots, a similarly shaded green basin held in front of Santa's midsection, and a hooked bubble wand held in Santa's right hand. To be sure, there are some minor differences in protectible elements. Adler's Santa has "crowfeet," and the irises of his eyes sit in the lower half of his eyeballs; WBI's Santa does not have crowfeet, and his irises sit in the center of his eyes. Adler's Santa has a small tuft of hair on his forehead; WBI's Santa does not. The beard of Adler's Santa is more full and detailed than the beard of WBI's Santa. And, Adler's Santa is wearing green mittens, whereas WBI's Santa is wearing black gloves. Although WBI also relies on differences in the two Santa's bases, postures and backs, the Court finds that these dissimilarities are all but irrelevant to the overall appearance of the Santas as displayed on their packaging or, more importantly, as they would appear to a consumer in their principal intended use, as ornaments hanging from a Christmas tree. The Court thus finds that "an ordinary lay observer would overlook the dissimilarities

between the artistic (*protectible*) aspects of the two works and would conclude that one was copied from the other." *Well–Made Toy,* 25 F.3d at 123 (emphasis added); *cf. Mattel,* 724 F.2d at 360 ("the district court reasonably found that the only parts of the dolls' bodies that constitute the protectable expression of an idea are not substantially similar"); *Tomy,* 630 F.2d at 915–18 ("the idea behind each toy is the same ... but ... [the] expression ... differs in every articulable respect").

The Court therefore concludes that Adler has demonstrated likelihood of success on the merits of its copyright infringement claim. This finding is sufficient to entitle Adler to a preliminary injunction, on the present record. For "[n]ormally, when a copyright is infringed, irreparable harm is presumed," *Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d 119, 124 (2d Cir. 1994) (citations omitted); and WBI has not rebutted the presumption that Adler will suffer irreparable harm as a result of WBI's infringement. Harold Adler could only speculate as to the extent of the monetary harm Adler would suffer if a preliminary injunction did not issue. *See* Testimony of Harold Adler, August 15, 1995. And, WBI's argument that it can account for any profits it earns, if and when Adler prevails on the merits, fails to appreciate the "incalculable and incurable" harm that Adler is likely to suffer in the event that a preliminary injunction does not issue, *Well–Made Toy,* 25 F.3d at 124. The Court therefore concludes that Adler is entitled to a preliminary injunction on its claim of copyright infringement.

## II. Trade Dress Infringement.

■ The Court next considers Adler's likelihood of success on the merits of its trade dress infringement claim. "To prevail on a claim of trade dress infringement, a plaintiff must establish (1) that its trade dress is distinctive either (a) because it is inherently so or (b) because it has acquired secondary meaning, and (2) that a likelihood of confusion exists between its product and the defendant's product." *Tough Traveler,* 60 F.3d at 967 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992)). "Even if the plaintiff establishes these elements, the defendant may still avoid liability on a variety of grounds, including the so-called functionality doctrine." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 79 (2d Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

The Court:

evaluate[s] the distinctiveness of trade dresses according to the test set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).... Under this test, dresses are classified as either: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.... Suggestive and arbitrary or fanciful trade dresses are considered to be inherently distinctive, and therefore always satisfy the first prong of the test for trade dress protection. If a dress is descriptive, however, the plaintiff must establish that it has acquired secondary meaning in order to become distinctive.... Generic dresses—"those that 'refe[r] to the genus of which the particular product is a species' "—are never protectable....

Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry. Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic elements *Cf. LeSportsac,* 754 F.2d at 76 (despite functionality of individual elements, bag was nonfunctional "when viewed in its entirety").... Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or "generic," to avoid tying up a product or marketing idea. *Cf. Stormy Clime,* 809 F.2d at 978 (referring to risk of monopolization of market where trade dress consists of "arrangement of predominantly functional features").

In evaluating claims to distinctive trade dresses, two additional considerations should be borne in mind. First ... over-

extension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas....

Second, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance.

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31–32 (2d Cir.1995) (citations and footnotes omitted).

The factors to be considered in determining functionality are:

"the degree of functionality of the similar features, the degree of similarity between the non-functional (ornamental) features of the competing products, and the feasibility of alternative arrangements of functional features that would not impair the utility of the product. These factors should be considered along a continuum. On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product."

*Id.* at 79–80 (quoting *Stormy Clime, Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 977 (2d Cir. 1987)).

Here, the Court finds that the "combination of elements" that Adler has employed is arbitrary or fanciful and, therefore, inherently distinctive. Adler's Christmas Bubble Santa obviously has some functional features, consisting of the stereotypical Santa elements and the bubble blowing mechanics, both of which element-groups are described above. However, these functional elements do not "predominate," *Stormy Clime,* 809 F.2d at 977. Rather, the overall impression created by Adler's Santa results not only from its functional elements, but also, and primarily, from its many ornamental fea-

tures—including the pear shaped head, red underlip emphasized, upcurving mustache, skin tone bubble nose, rounded boots, green basin held in front of Santa's midsection, and hooked bubble wand held in Santa's right hand. Providing trade dress protection to Adler's Christmas Bubble Santa would neither foreclose would-be competitors from employing the utilitarian features "necessary to the use or efficient production of [bubble blowing Santas]," *Wallace,* 916 F.2d at 80, nor would foreclose them from employing the aesthetic features "necessary to compete in the market for [bubble blowing Santas]," *id.* at 81. Instead, as found above, a nearly limitless variety of expressions remains available to one who seeks to compete with Adler's Christmas Bubble Santa. *Cf. id.* (denying protection where, unlike here, plaintiff sought "trademark protection, not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain.").

■ Having concluded that Adler's trade dress is inherently distinctive, the Court turns to the issue of likelihood of confusion. The Court of Appeals for the Second Circuit has

traditionally determined likelihood of confusion by applying the factors set out by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).... [However], the list of *Polaroid* factors is not exclusive and the analysis of the factors is not a mechanical process.... The issue is not similarity in the abstract, but whether the similarity between the two trade dresses will contribute to consumer confusion as to the origin of the product.

*Merriam–Webster, Inc. v. Random House,* 35 F.3d 65, 70 (2d Cir.1994) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). The *Polaroid* factors include:

(1) the strength of the plaintiff's ... dress; (2) the similarity between the two ... dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that

the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.

*Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 584 (2d Cir.1993) (citations omitted). The Court now endeavors to make the requisite "thorough, delineated analysis of the eight *Polaroid* factors." *Arrow Fastener Co. v. The Stanley Works*, 59 F.3d 384, 399 (2d Cir.1995).

Turning first to strength:

The term "strength" refers to a mark's tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.... A court's inquiry regarding the strength of a mark often parallels the inquiry concerning the mark's validity, inasmuch as the strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.

*Id.* at 391 (citations and internal quotation marks omitted). Here, for reasons stated above, the Court finds that Adler's trade dress is arbitrary or fanciful and, therefore, inherently distinctive. However, the stereotypical Santa features and bubble blowing mechanical elements, which are significant aspects of Adler's overall dress, are functional, weakening somewhat the strength of Adler's dress. Therefore, although "strength may result solely from the mark's inherent distinctiveness," *Paddington*, 996 F.2d at 585, the Court concludes that Adler's trade dress is moderately strong.

Moving on to similarity:

In applying this factor, courts consider whether the similarity of the marks is likely to cause confusion among potential customers.... In judging similarity, courts are to consider all factors that could reasonably be expected to be perceived by and remembered by potential purchasers.... [S]imilarity is determined on the basis of the total effect of the [dress], rather than on a comparison of individual features.

*Arrow Fastener*, 59 F.3d at 394–96 (citations and internal quotation marks omitted). Here, quite simply, the Court finds a "marked similarity" in the total effect created by the two dresses.

Taking up proximity and bridging the gap, there is no dispute that the two Santas at issue here are directly competitive. And "in [the] case of competing products ... proximity of the products in the marketplace ... is necessarily answered in favor of the senior user, and ... the likelihood of bridging the gap ... is not a relevant inquiry." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.1992).

With respect to actual confusion, there is no evidence of actual confusion, because the products have yet to reach retail consumers. But "the absence of actual confusion alone is not dispositive of the question of likelihood of confusion." *Arrow Fastener*, 59 F.3d at 397 (citation and internal quotation marks omitted).

Turning then to the junior user's bad faith, which is a particularly important consideration on the facts of this case, the relevant inquiry is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Id.* (citation and internal quotation marks omitted).

Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion.... In determining a defendant's intent, actual or constructive knowledge of the prior user's ... dress may indicate bad faith.... Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, [the Second Circuit] ha[s] upheld findings of bad faith.

*Paddington*, 996 F.2d at 586–87 (citations and internal quotation marks omitted); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980) ("If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance

and will be presumed to have succeeded.") (collecting authorities). Here, as described in the copyright analysis above, the Court finds access and an uncanny resemblance, causing the Court to discredit WBI's evidence of independent creation, and to find actual copying. The Court further finds that Adler has an excellent reputation, and that the intentional copying was designed to capitalize on Adler's reputation and goodwill and any confusion created as to the origin of WBI's product.

Proceeding to the issue of the quality of defendant's product: "This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener*, 59 F.3d at 397–99 (citation omitted). Here, the "mat finish" and the detail on Adler's product create an appearance that it is of higher quality than WBI's product, but the rotating arm on WBI's product makes WBI's product more durable than Adler's. At bottom, the Court finds no appreciable difference in the overall quality of the two products.

Arriving finally at the issue of the sophistication of the relevant consumer group: "This ... factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Id.* (citation omitted). Here, given the nature of the product, the Court finds that the relevant consumer group is retail Christmas shoppers, and that children are likely to be a driving force in generating many sales, reducing somewhat the sophistication of the relevant consumer group, *see, e.g., Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1199 (E.D.N.Y.1983). The Court rejects WBI's contention that professional buyers are the relevant consumer group. Professional buyers are merely a step in the chain of distribution from Adler to the actual consumers of this product. Adler's claim is that WBI's trade dress will cause confusion among these actual consumers, with corresponding loss of sales and goodwill. Even if professional buyers would not be confused as to the sources of the respective Santas, this does not mean

that Adler will not suffer lost sales and goodwill among retail consumers, as a result of WBI's trade dress, if a preliminary injunction does not issue. The Court further finds that the product's retail price is relatively modest for a Christmas gift, *see, e.g.*, PX 69 (Horchow catalogue: retailing Adler's Santa for $29.90); PX 70 (Parkwest catalogue: retailing Adler's Santa for $27.95),[3] and that this is not conducive to careful retail consumer selectivity. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979).

By way of recapitulation, then, the dress of WBI's Musical Bubble Blowing Santa is a strikingly similar, directly competitive, bad faith copy of the inherently distinctive, moderately strong dress of Adler's Christmas Bubble Santa. The products are modestly priced and children are an important segment of the relevant consumer group, retail Christmas shoppers. Taking these factors into consideration, although there is no evidence of actual confusion, the Court finds that there is a likelihood of consumer confusion as to origin. The Court thus also concludes that Adler has shown a likelihood of success on the merits of its trademark infringement claim.

This finding also goes far toward establishing Adler's entitlement to a preliminary injunction on the ground of trade dress infringement. For, "[i]n a trademark case, irreparable injury may be found where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.... When a plaintiff has shown a high probability of confusion, there is normally a presumption of irreparable harm." *Tough Traveler*, 60 F.3d at 967. Here, Adler has amply shown a high probability of confusion, entitling it to a presumption of irreparable harm, which, as described above, WBI has not rebutted. However, even without the benefit of the presumption, Adler would be entitled to a finding of irreparable harm, based on the strength of its affirmative showing of likelihood of confusion.

**3.** The Court finds that WBI's Santa is expected to retail at approximately $20.00 per item.

The Court thus concludes that Adler is entitled to a preliminary injunction on its claim of trade dress infringement, as well as on its claim of copyright infringement.

### III.  The Amount of the Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides, in relevant part:

> No ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c).  WBI seeks a bond in the amount of $3,736,086, consisting of posted and shipped merchandise valued at $102,-256.80; orders on hand totalling $1,133,750; anticipated sale of the balance of merchandise represented by its purchase order to Markwort Industries in the amount of $1,263,880; plus the cost of prospective litigation from its customers to recover lost profits on merchandise that WBI is contractually bound to deliver, which WBI states is $1,236,200.  Adler responds that it is unrealistic to include litigation costs in the bond amount and to assume, as WBI does, that WBI would be unable to sell the goods at any price in a future year.  A more reasonable bond amount, in Adler's view, would consist of the net sales revenue that Adler would lose in the event that a preliminary injunction issued.

The Court finds that there is no basis upon which to consider any prospective litigation costs in the bond analysis, because neither Adler nor WBI has ever been sued by a customer for failing to fill an order.  The Court further finds it reasonable to expect that WBI could sell its products next year at a discount of approximately 20 percent.  The Court thus finds that WBI's lost gross sales revenue as a result of the injunction is approximately $500,000 ($2,500,000 × .20).[4]  To reach lost net sales revenue, the Court deducts 13 percent, which WBI's President testified reflects an appropriate deduction for

the relevant costs of sales, yielding a total bond of $435,000.

### CONCLUSION

Adler's motion for a preliminary injunction is HEREBY GRANTED, effective immediately, provided that Adler posts a bond of $435,000, by August 18, 1995 at 5:00 P.M. The terms of the preliminary injunction are those provided in this Court's Order to Show Cause, entered July 27, 1995.

**SO ORDERED.**

---

4.  This figure (generously) assumes that WBI would have been able this year to sell all $2,499,-886.80 worth of the Santas that it ordered.